UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARIA SAMPSON,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )        No. 4:07 CV 591 RWS
                                  )                          DDN
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

     This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Maria Sampson for disability insurance benefits
and supplemental security income under Title II and Title XVI of the
Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et
seq.  The action was referred to the undersigned United States Magistrate
Judge for review and a recommended disposition under 28 U.S.C. § 636(b).
For the reasons set forth below, the undersigned recommends that the
ALJ's decision be affirmed.

### I.  BACKGROUND

     Plaintiff Maria Sampson was born on September 6, 1957.  (Tr. 58.)
She is 5'4" tall, with a weight that has ranged from 150 pounds to 174
pounds.  (Tr. 73A, 257.)  She completed high school and one year of
beauty college, and can read and write English.  (Tr. 257, 264.)  She
last worked as a customer service representative in 2002.  (Tr. 78.)

     On June 30, 2005, Sampson filed for supplemental security income and
disability insurance benefits, alleging she became disabled on September
15, 2002, as a result of rotator cuff surgery and problems with her right
arm.  (Tr. 58, 258.)  The application was initially denied on August 12,
2005.  (Tr. 53-55.)  After a hearing on November 9, 2006, the ALJ denied
benefits on December 21, 2006.  (Tr. 12-23, 315-34.)  On February 6,

2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2.)

## II.  MEDICAL HISTORY

On an unknown date, Sampson completed a disability report, stating her right rotator cuff limited her ability to work.  She also had muscle spasms in her back when she sat for too long, had limited range of motion, and was unable to lift anything over five pounds or anything bulky that would require two hands.  Her impairments began in 2001, and caused her pain.  She stopped working at the beauty shop because of her impairments, and tried working a desk job in March 2002, "but could not sit long [] enough to do what was expected of me."  She was let go "due to [her] condition" in August 2002.  From 1980 to 2003, Sampson saw Dr. Richard Hartman for primary care.  From July to August 2001, she saw Dr. William Schroer for surgery on her right shoulder and for a physical therapy referral.  From July to October 2001, Sampson saw Richard Maurer for physical therapy.  She took Aleve for pain relief and Estrace to balance her hormones.[1]  In April 2001, she had an MRI, a CT scan, and an x-ray of her shoulder.  Sampson did not list any other medical tests. (Tr. 81-87.)

On April 11, 2001, Sampson completed a patient registration form to see Dr. William C. Schroer, M.D.  She complained of right shoulder and arm trouble, with bone popping, numbness, and tightness in her neck and back.  At the time, she was taking Estrace and Vioxx.[2]  She did not smoke or drink.  She tried to follow a regular exercise program of walking and sit-ups.  A physical examination showed Sampson had full passive range of motion in the right shoulder, and actively had forward elevation that was painful past 120 degrees of flexion and 100 degrees of abduction. Sampson had a positive impingement sign, but no evidence of abductor

---

[1]Aleve, or Naproxen, is used to relieve mild to moderate pain from various conditions.  Estrace is a female estrogen hormone used to treat common menopausal symptoms, such as hot flashes. http://www.webmd.com/drugs. (Last visited August 4, 2008).

[2]Vioxx was used to treat arthritis pain, but is no longer prescribed.  http://www.webmd.com/drugs. (Last visited August 4, 2008).

weakness or anterior glenoidal labral pathology.[3]  She was negative for Yergason's sign.[4]  Sampson had recently received a corticosteroid injection.[5]  (Tr. 281-83.)

On April 19, 2001, Sampson saw David Grant, PT, complaining about arm and back pain.  She was still working as a hairdresser, but the pain required her to take fewer clients.  Sampson said the corticosteroid injection had relieved her pain, but that it was starting to increase again.  Grant believed that Sampson needed skill rehabilitative therapy, along with a home exercise program, to address her problems.  At the same time, he believed her rehabilitation potential was good.  Sampson hoped to return to working full-duty.  (Tr. 286-88.)

On May 2, 2001, Sampson saw Dr. Schroer.  Sampson noted improvement with the physical therapy.  A physical examination showed she had full forward elevation and abduction, but that she continued to have

_____

[3]Impingement syndrome is a common condition affecting the shoulder and is closely related to shoulder bursitis and rotator cuff tendinitis. These conditions may occur alone or in combination.  Common symptoms of impingement include difficulty reaching up behind the back, pain with overhead use of the arm, and weakness of the shoulder muscles. http://www.webmd.com/osteoarthritis/guide/impingement-syndrome.  (Last visited August 4, 2008.)
The abductor is a muscle that draws a part toward the median plane. Stedman's Medical Dictionary, 23 (25th ed., Williams & Wilkins 1990). The glenoidal labrum is a ring of cartilage attached to the shoulder joint, which increases its depth.  Id., 832, 1386.

[4]Yergason's sign is used to test for an injury to the biceps tendon. See Lori B. Siegal, M.D., et al., Adhesive Capsulitis: A Sticky Issue, American Family Physician (April 1, 1999), available at http://www.aafp.org/afp/990401ap/1843.html.  (Last visited August 4, 2008).

[5]A corticosteroid is a steroid hormone produced in the adrenal cortex, and may be used to decrease inflammation and pain associated with rotator cuff disorders.  Stedman's Medical Dictionary, 361; http://www.webmd.com/a-to-z-guides/corticosteroid-injections-for-rotat or-cuff-disorders.  (Last visited August 4, 2008).

significant subacromial pain and crepitation.[6]  Sampson said the Vioxx was not helping.  Dr. Schroer gave her a subacromial injection.  (Tr. 283.)

On May 17, 2001, Sampson saw Dr. Schroer, complaining of no improvement in her right shoulder.  She also noted increasingly more symptoms radiating from her neck down her arm.  Sampson had paresthesias in her arm and hand, radiating to her thumb and index side.[7]  She had continued difficulty raising her arm, but had nearly full passive range of motion.  She had negative impingement, but ongoing weakness in abduction.  Dr. Schroer expressed concern about a cervical disk and ordered an MRI.[8]  (Tr. 284.)

On May 17, 2001, Sampson saw Grant.  She was still having shoulder pain, but it was getting better since she had been taking time off.  At the time of this visit, she was not working.  Grant recommended Sampson continue with her current rehabilitation program.  (Tr. 289-91.)

On May 21, 2001, Dr. Richard A. Koch, M.D., reviewed an MRI of Sampson's cervical spine.  The MRI revealed a hypertrophic change involving the right joint at C3-4, with some encroachment upon the right

---

[6]The acromion is a part of the scapula (the shoulder blade). Stedman's Medical Dictionary, 19, 1386-87.  Crepitation refers to crackling, and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together.  Id., 368.

[7]Paresthesia is an abnormal sensation, such as burning, pricking, or tingling.  Stedman's Medical Dictionary, 1140.

[8]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.

lateral recess at C3-4.[9]  There was no evidence of any spinal stenosis, and there was no other focal disk protrusion.[10]  (Tr. 300.)

On May 30, 2001, Sampson saw Dr. Schroer, complaining of shoulder pain.  Dr. Schroer did not believe the MRI explained the symptoms in her right upper extremity.  Sampson had minimal paresthesias and symptoms radiating down her arm.  "Passively, she can be taken through a full range of motion though sometimes the motion has to be deceptively done."  Dr. Schroer ordered an MRI to look for intra-articular pathology as opposed to irritation of the supraspinatus.[11]  (Tr. 284.)

On June 2, 2001, Dr. Koch reviewed an MRI of Sampson's right shoulder.  The MRI revealed a tear of the supraspinatus tendon, which appeared to be a complete tear.  There was also some altered signal intensity present within the infraspinatus tendon, suggesting an injury to the tendon, or a partial thickness tear.[12]  The subscapularis tendon and the glenoidal labrum were intact.[13]  The biceps tendon was in the groove and there was a normal bone marrow signal.  (Tr. 301.)

On June 18, 2001, Sampson had surgery to repair a right rotator cuff tear.  Dr. Schroer fixed the tear with four sutures, and placed Sampson in a sling after the operation.  She was in stable condition.  Sampson was to start pendulum exercises the following day.  Dr. Schroer

---

[9]Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation.  Stedman's Medical Dictionary, 746.

[10]Stenosis is the narrowing or constriction of any canal.  Stedman's Medical Dictionary, 1473.

[11]Articular refers to the joints.  Stedman's Medical Dictionary, 136.  The supraspinatus is a muscle of the back of the shoulder, and makes up the rotator cuff.  It helps abduct the arm.  See Stedman's Medical Dictionary, 1006, Plate 8.

[12]The infraspinatus is a muscle of the back of the shoulder, just below the supraspinatus.  It helps extend the arm and rotate it laterally.  Stedman's Medical Dictionary, 999, Plate 8.

[13]The subscapularis is a muscle of the shoulder, which rotates the arm medially.  Stedman's Medical Dictionary, 1005.

prescribed Vicodin for her pain, and told her to continue icing her shoulder for the next three days.[14]  (Tr. 285, 303-06.)

On June 19, 2001, Sampson saw Grant, complaining of shoulder pain. At its worst, she rated the pain at 2/10.  Sampson was not working because working caused her too much pain.  A physical examination showed she was limited in her ability to reach behind her back and raise her arm overhead, and was mildly limited in her ability to reach behind her head and carry ten pounds at her side.  Grant recommended she continue with her current rehabilitation program.  (Tr. 292-94.)

On July 5, 2001, Sampson saw Dr. Schroer, for a follow-up of her surgery.  Her incision was healing well, and she had no drainage, no erythema, or evidence of infection.[15]  She was to continue wearing her sling, and was to begin formal therapy for passive range of motion.  (Tr. 285.)

On July 6, 2001, Sampson completed a disability report, stating she became unable to work on May 2, 2001.  On June 18, 2001, she had right rotator cuff surgery.  Her rotator cuff limited her ability to work.  She could not use her right arm and could not lift anything with that arm. Sampson stated that her doctor told her not use her right arm, and told her she could not do any work.  She experienced pain from her injuries. From 1987 to 2001, Sampson worked nine to ten hours a day, five days a week, as a beautician.  As part of the job, she walked eight hours a day, stood nine or ten hours a day, handled objects eight hours a day, and sat, kneeled, and crouched thirty minutes a day.  She lifted up to twenty pounds, and frequently lifted ten pounds.  From May to July 2001, Sampson saw Dr. Schroer for x-rays, tests, and for physical therapy referrals. From 1992 to 1999, Sampson saw Dr. Richard A. Hartman, her obstetrician-gynecologist.  Dr. Hartman removed tumors, performed a hysterectomy, and

---

[14]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain.  http://www.webmd.com/drugs. (Last visited August 4, 2008).

[15]Erythema is inflammatory redness of the skin.  Stedman's Medical Dictionary, 533.

prescribed estrogen.[16] From 1996 to 1998, Sampson saw Dr. Hilliard Scott to treat her bronchitis. In May or June 2001, Sampson underwent a breathing test. In June 2001, she underwent an MRI and x-ray of her neck and shoulder. (Tr. 258-66.)

On July 9, 2001, Sampson saw Grant, complaining of shoulder pain. The pain would wake her up at night, and made it difficult to cook, do the dishes, fix her hair, and drive. She was unable to work, and rated the pain as 7/10. (Tr. 295-96.)

On July 11, 2001, Sharon D. Byrd completed a disability report after a face-to-face interview with Sampson. Byrd noted that Sampson had no difficulty hearing, reading, breathing, understanding, speaking coherently, concentrating, talking, answering, sitting, standing, walking, or seeing. Sampson had difficulty using her hands and writing. Byrd observed that Sampson "was in obvious pain throughout [the] interview. She could not move her right arm and her hands appeared stiff." Sampson was pleasant, attractive, and well-spoken. (Tr. 267-70.)

On July 25, 2001, Dr. Schroer ordered physical therapy for Sampson. Her physical therapy was to involve rehabilitation of her rotator cuff. Sampson was still having difficulties with passive range of motion. (Tr. 213, 285.)

On July 27, 2001, Todd Maurer, M.S.P.T., wrote to Dr. Schroer, explaining Sampson's physical therapy progress. Sampson had undergone rotator cuff surgery on June 18, 2001. Sampson was complaining of tightness, decreased range of motion, decreased ability to raise her arm up, and decreased ability to perform passive external rotation. Her right shoulder was very painful and she also experienced pain in the muscle near her shoulder blade. Maurer noted that Sampson's shoulder joint mobility was minimally hypomobile with moderate presentation, secondary to severe guarding.[17] Maurer planned to see Sampson three times

---

[16]A hysterectomy is the complete removal of the uterus. Stedman's Medical Dictionary, 756.

[17]Hypomobile means capable of a smaller range or frequency of movement than normal. Merriam-Webster's Online Medical Dictionary,
(continued...)

a week, for four to six weeks, working with her on passive range of motion, pulleys, joint mobilizations, and progression to active range of motion. (Tr. 237-39, 307-09.)

On August 9, 2001, Grant completed a discharge summary. He noted that Dr. Schroer was unhappy with Sampson's progress, and was sending her to a different rehabilitation facility. (Tr. 297-99.)

On August 10, 2001, Sampson completed a pain questionnaire. When she raised her arm to the level of her chest, she experienced a sharp pain at the right rotator cuff. The pain was present all the time, and movement of her arm brought on the pain. The pain would radiate to the back of her shoulder, as well as to the middle of her back. To help with the pain, Sampson iced her shoulder, wore a sling, and took Propoxyphene.[18] (Tr. 271.)

On August 12, 2001, Sampson completed a claimant questionnaire for a state disability determination. Sampson complained of shortness of breath and weakness in her right arm and hand. She iced her shoulder for fifteen minutes, three times a day, and took Propoxyphene. Sampson lived with her two sons. Because of her impairments, she was unable to wash dishes, comb her hair, raise her arm above her head, cook, wash, or drive. She had to sleep in her sling and in an elevated position. Her sons and friends provided assistance and would take her shopping or to church. Sampson left her house regularly, going to therapy, Bible study, the grocery store, or to church. She was able to do some light cleaning, and could wash one or two loads of clothes. She had no trouble using the phone or getting along with others. (Tr. 272-75.)

On August 15, 2001, Maurer wrote to Dr. Schroer, explaining Sampson's physical therapy progress. Sampson stated that her motion was a lot better, and that while her shoulder was sore, it was improving.

---

[17](...continued)
http://medical.merriam-webster.com/medical/hypomobile. (Last visited August 4, 2008). Guarding is characterized by a spasm of muscles to minimize motion or agitation of sites affected by an injury or disease. Stedman's Medical Dictionary, 674.

[18]Propoxyphene is a narcotic pain reliever, used to treat mild to moderate pain. http://www.webmd.com/drugs. (Last visited August 4, 2008).

Maurer found Sampson was making excellent progress with her range of motion, but still had significant tightness and guarding, and lacked strength. Sampson was only reporting minimal soreness after therapy. (Tr. 234, 312.)

On August 15, 2001, Dr. Schroer noted Sampson was making significant improvement. A physical examination showed Sampson had nearly full passive forward elevation. Her abduction was still limited, and she was extremely tight in external and internal rotation. Dr. Schroer advised Sampson to continue physical therapy twice a week, for four weeks. (Tr. 162, 285.)

On September 4, 2001, Maurer wrote to Dr. Schroer, explaining Sampson's physical therapy progress. Sampson stated that her shoulder was getting a lot better, and was starting to feel stronger. Maurer found she had made steady improvements in her range of motion and shoulder strength. He believed Sampson would continue to benefit from physical therapy, and that she did not have the range of motion or strength necessary to return to work at full duty. (Tr. 232.)

On September 4, 2001, Dr. Schroer advised Sampson to continue physical therapy twice a week, for four weeks. (Tr. 161.)

On October 1, 2001, Maurer wrote to Dr. Schroer, explaining Sampson's physical therapy progress. Sampson had stated that her shoulder was getting better, but that she had not gotten all of her motion back just yet. She had mild adhesive capsulitis and had mild tightness and pain at the end ranges.[19] Still, Sampson had made steady progress with her range of motion and strength. (Tr. 229.)

On October 2, 2001, Dr. Schroer advised Sampson to continue physical therapy twice a week, for four weeks. (Tr. 160.)

On October 16, 2001, Sampson had a mammogram. The mammogram showed no evidence of malignancy. (Tr. 157.)

On October 31, 2001, Sampson saw Dr. Hartman for an annual check-up. She noted headaches, night sweats, eye pain, pelvic pain, and abdominal

---

[19]Adhesive capsulitis is a condition in which there is a limitation of motion in a joint due to inflammatory thickening of the capsule - a common cause of stiffness in the shoulder. Stedman's Medical Dictionary, 241.

pain.  Occasionally, Sampson said she felt a twinge or pain in her left side, but that putting a pillow there relieved the pain.  She denied any joint, neck, or back pain.  (Tr. 153-54.)

On November 5, 2001, Sampson stated her range of motion was getting better and that she felt like her shoulder had gotten stronger overall. Maurer also found Sampson had made good progress with the range of motion and general strength in her right shoulder.  He found Sampson was progressing steadily with right upper extremity strength and her overall functional improvements.  (Tr. 224.)

On November 26, 2001, Sampson stated she was a little stiff, but doing very well.  Maurer found she performed all the activities without any increase in pain or symptoms.  Sampson was showing progress with respect to her range of motion, with decreasing subjective pain reports. She still had significant limitations with flexion and abduction.  Maurer believed she had capsular tightness or adhesive capsulitis.[20]  (Tr. 225.)

On December 5, 2001, Maurer wrote to Dr. Schroer, explaining Sampson's physical therapy progress.  Sampson stated that she was a lot better and was going to continue working on her home program.  Maurer found Sampson had made excellent progress since starting therapy and that her range of motion had become extremely functional.  He found Sampson was independent, and could continue the remainder of her progress with the home program.  Sampson had some mild capsular tightness, and end ranges of flexion and abduction that remained a limiting factor.  (Tr. 222-23.)

On February 7, 2002, Maurer completed a physical therapy discharge summary.  He noted that Sampson had attended physical therapy thirty-six times from July 27 to December 5, 2001.  Sampson's diagnosis had been right rotator cuff repair, and Maurer found Sampson had recovered. Recovery was defined as regaining a pre-injury level of function, and either achieving 75% of the goals, or reaching a maximum rehabilitation potential during the program.  (Tr. 217.)

---

[20]A capsula is a membranous structure, usually of dense connective tissue, that envelops an organ, a joint, or any other structure. Stedman's Medical Dictionary, 240.

On June 26, 2002, Sampson wrote to the Social Security Administration, noting she would not be attending a hearing on an earlier application for benefits. "I am recovering very well and I don't see a need for [an] appeal or hearing at this time." (Tr. 251.)

On November 25, 2002, Sampson saw Dr. Hartman for her annual visit. Sampson complained of muscle and back spasms, and neck and back pain, but the doctor found her physical exam was fine. Sampson noted night sweats and emotional swings. The notes indicate Sampson had been working at Wells-Fargo for six-months, but that she had been downsized. Dr. Hartman continued her on Estrace, gave her some samples of Gynodiol, another estrogen hormone, and prescribed Naproxen (Anaprox). (Tr. 146, 151-52.)

On December 3, 2003, Sampson saw Dr. Hartman. Sampson said she was doing well, without any major complaints or problems. She noted some hot flashes. (Tr. 146.)

On December 3, 2003, Sampson received a pap smear. The pap smear was negative for lesions or malignancy. During the visit, Sampson complained of shortness of breath, back pain, neck pain, and thrombophlebitis.[21] (Tr. 143-44.)

On December 9, 2003, Dr. Edward G. Pepper, M.D., reviewed an x-ray of Sampson's hip and lumbar spine. The x-rays revealed normal bone mineral density for her hip and lumbar spine. Dr. Pepper also reviewed a mammogram, which showed no malignancies. (Tr. 147-50.)

On January 30, 2004, Sampson called Dr. Hartman, asking for a refill of her Estrace. She said the 1mg tablets were giving her chest pain, so she stopped, and was going to return to taking the 2mg tablets. (Tr. 146.)

On January 11, 2005, Sampson received a mammogram. There was no evidence of malignancy. (Tr. 141.)

On March 9, 2005, Sampson received a pap smear. The doctor noted a total hysterectomy in 1992. The pap smear was negative for lesions or malignancy. (Tr. 121.)

---

[21]Thrombophlebitis is inflammation of the veins with clotting. Stedman's Medical Dictionary, 1596-97.

On March 29, 2005, Sampson complained about the doctor lowering her dosage of Estrace.  She was diagnosed with anxiety and back pain.  (Tr. 132.)

On June 23, 2005, Sampson was diagnosed with depression / anxiety, hot flashes, and muscle strain.  (Tr. 131.)

On July 9, 2005, Sampson completed a function report.  In a typical day, she would wake up at 5:00 a.m., wash up, watch television, prepare breakfast, take her vitamins and medication, and go for a walk.  She would read, go to church, come home, shower, and then go to bed.  Her muscle spasms made breathing difficult, which disrupted her sleep.  Sampson made meals for herself every day, cleaned her house regularly, and ironed occasionally.  She did not need any encouragement to do these tasks.  She used public transportation and regularly went outside.  Once a month she went shopping.  She enjoyed collecting recipes, reading, watching television, and going to church.  She could not sit for long without her back hurting and could lift five pounds.  Her impairments affected her ability to lift, reach, sit, and concentrate.  She could walk half a mile before needing ten minutes of rest.  She could pay attention for thirty minutes, had trouble paying attention, and did not finish what she started.  She reported crying spells and feelings of hopelessness.  (Tr. 74-77A.)

On July 9, 2005, Sampson completed a work history report.  From 1978 to 2000, she worked as a cosmetologist at a beauty shop.  From March to August 2002, she worked as a customer service representative for Wells-Fargo.  At the beauty shop, Sampson worked eight hours each day, five days a week, cutting and coloring hair.  Each day, she walked two and a half hours, stood seven and a half hours, sat for one hour, and handled objects for six hours. She lifted less than ten pounds. At Wells-Fargo, she worked eight hours a day, five days a week, entering data and preparing mortgage forms.  Each day, she walked a half hour, stood a half hour, sat for seven hours, and typed seven hours.  She lifted up to fifty pounds, but frequently lifted less than ten pounds.  (Tr. 78-80.)

On August 2, 2005, Sampson saw Dr. Cason, complaining of shoulder pain from surgery on her right rotator cuff.  Sampson said she had the surgery in July 2002, and participated in physical therapy after the

surgery. Sampson complained that her shoulder got painful and stiff in damp and cold weather, but that she could write and hold a cup of coffee without any help. In a typical day, Sampson did chores, shopped for groceries, and went to church. At the time, she was not taking any prescription medication, and denied using tobacco or alcohol. A physical examination showed her lungs were clear and her heart was normal. Her back had normal range of motion without any tenderness or spasms. Straight leg raises were negative. Sampson was able to heel, toe stand, and squat. Her gait and station were normal, and she did not need any assistive devices. The major muscle group strengths of the upper and lower extremities were normal, and she had full grip strength in each hand. Sampson's knee and elbow motions were normal, but her right shoulder motion was slightly decreased. There was also a slight tenderness over the right shoulder area. The remainder of the musculoskeletal examination was unremarkable. A mental examination showed Sampson was alert and oriented, with cranial nerves intact. Dr. Cason diagnosed Sampson with a slight loss of motion in her right shoulder, and slight tenderness over the right shoulder area. (Tr. 135-39.)

On September 1, 2005, Sampson completed a disability report appeal. She noted feeling worse as of July 2005, but noted that medication would return her to her previous condition. Her concentration and memory were also worse than before, but she did not have any new injuries or conditions. At the time, she was taking Effexor.[22] Sampson bathed regularly and was able to dress and groom herself, but sometimes lacked the motivation to get dressed, and would stay in her housecoat all day. She had started studying for an insurance test, but had difficulty concentrating. (Tr. 66-68.)

On October 7, 2005, Sampson stopped taking Effexor, complaining that the drug made her sleepy and gave her dry-mouth. At the time, she was suffering from anxiety attacks, the result of multiple stressors, but which principally involved concerns that her gas and electricity could

_____

[22]Effexor is an anti-depressant used to treat depression and mood disorders. http://www.webmd.com/drugs. (Last visited August 4, 2008).

-13-

be cut off.  Sampson noted panic attacks and multiple episodes of sexual abuse as a teenager.  She also complained of a right shoulder strain and breast tenderness.  She was diagnosed with depression and anxiety, hot flashes, and muscle strain.  (Tr. 131.)

On October 10, 2005, Linda Kamp, a social worker, noted Sampson was receiving treatment for behavioral health issues, such as anxiety, panic, and depression.  These disorders included features related to emotional distress, self-defeating cognitive and behavioral rituals, distressing physical symptoms characterized by distress and body tension, sleep and appetite disturbance, feeling out of control, and having difficulty coping.  (Tr. 88.)

On October 16, 2005, Dr. Martin Docherty, M.D., treated Sampson in the emergency room.  Dr. Docherty diagnosed her with pain in the radicula, and prescribed her Ibuprofen and Hydrocodone / Acetaminophen.[23] (Tr. 114-15.)

On October 21, 2005, Sampson went to Community Health in Partnership Services (CHIPS) for a flu visit.  She had recently been to the emergency room for right arm pain and right neck pain.  She was given Vicoden, Ibuprofen, and Percocet.[24]  At the time of this visit, Sampson was taking Cyclobenzaprine, Hydrocodone, Ibuprofen, and Flexeril.[25]  Because her anxiety had decreased, she had stopped taking Effexor.  She was diagnosed with cervical radiculopathy and anxiety.[26]  (Tr. 130, 133.)

---

[23]The radicula is a spinal nerve root.  Stedman's Medical Dictionary, 1308.  Ibuprofen is an anti-inflammatory drug used to relieve pain and swelling.  Hydrocodone is a narcotic pain reliever, used for a short period of time, to treat moderate to severe pain.  Acetaminophen, or Tylenol, is used to relieve pain and reduce fever. http://www.webmd.com/drugs. (Last visited August 4, 2008).

[24]Percocet is an opiate-type medication, used to relieve moderate to severe pain.  http://www.webmd.com/drugs. (Last visited August 4, 2008).

[25]Cyclobenzaprine and Flexeril are muscle relaxants used to treat muscle pain and spasms.  http://www.webmd.com/drugs. (Last visited August 4, 2008).

[26]Radiculopathy is a disease of the spinal nerve roots.  Stedman's Medical Dictionary, 1308.

On November 8, 2005, Dr. Jesse Poblete, M.D., a radiologist, reviewed an x-ray of Sampson's cervical spine and right shoulder. Dr. Poblete found no evidence of a compression fracture or subluxation, and concluded she had a normal cervical spine.[27] Dr. Poblete noted minimal degenerative joint disease in Sampson's right shoulder, without any evidence of fractures, dislocations, or other significant bony pathology. (Tr. 124.)

On November 18, 2005, Sampson went to CHIPS, complaining of pain, numbness, and stiffness in her legs, pain in the right side of her neck, and trouble sleeping. She was diagnosed with depression / anxiety and back pain. (Tr. 129.)

On January 13, 2006, Sampson went to CHIPS, complaining that she ached all over and that her right leg shook sometimes. She had an appropriate and flat affect. She was diagnosed with depression / anxiety, malaise, and back problems. She was prescribed Naproxen and Lexapro, and referred to neurology.[28] (Tr. 126.)

On January 27, 2006, Sampson went to Connect Care, complaining of muscle spasms in the back and neck, triggered by anxiety. The spasms were very painful, lasting several minutes and cutting off her breath. Sampson said the episodes resolved spontaneously. Her right leg occasionally felt tingly with these episodes, and sometimes shook. There was no pain associated with the shaking, and Sampson could make the shaking stop voluntarily. A physical examination showed Sampson was comfortable and in no acute distress. She was talkative and pleasant, with muscle strength at 5/5, except at the right hip flexor, which was 4/5. Her gait was symmetric and normal, she reported no pain at the neck, full range of motion, no tenderness, and there was no evidence of radiculopathy on exam. The doctor did not observe any shaking at the right lower extremity. Sampson had gained thirty pounds in the last six months. She suffered from depression, right carpal tunnel syndrome, and

[27]Subluxation is an incomplete dislocation. The normal relationship is altered, but there is still some contact between joint surfaces. Stedman's Medical Dictionary, 1494.

[28]Lexapro is an anti-depressant used to treat depression and anxiety. http://www.webmd.com/drugs. (Last visited August 4, 2008).

a torn right rotator cuff. At the time, Sampson was taking Lexapro, Flexaril, and vitamins. (Tr. 91-92.)

On January 27, 2006, Dr. Landau found Sampson was stable with the Lexapro, that her right shoulder was fine, but that she had somatoform symptoms with depression and anxiety.[29] (Tr. 93.)

On February 15, 2006, Sampson went to CHIPS. She was diagnosed with depression. (Tr. 90.)

On March 3, 2006, Sampson was evaluated at CHIPS by the neurology department. Sampson expressed concerns about her depression, and noted the Lexapro had reduced her crying episodes. She also reported unbearable hot flashes. (Tr. 95.)

On March 3, 2006, Dr. Ingrid Taylor, M.D., completed a physician's certification / disability evaluation for the Missouri Department of Social Services. Sampson had a history of calluses on her feet, hyperlipidemia, and swelling of her legs.[30] Dr. Taylor believed Sampson had a disability which prevented her from working. Dr. Taylor believed the disability would last two months. (Tr. 105-05A.)

On April 24, 2006, Dr. Poblete reviewed an x-ray of Sampson's right wrist. Dr. Poblete found there was minimal degenerative joint disease without any evidence of fractures, dislocation, or other significant bony pathology in her right wrist. (Tr. 104.)

On June 23, 2006, Sampson went to Connect Care, complaining of an aching, sharp pain in her forearm, spreading into her hands. The symptoms started whenever she worked with her hands. She noted weakness and pain, which was relieved with rest. Sampson was diagnosed with depression and carpal tunnel syndrome. (Tr. 102.)

On September 1, 2006, the Oak Park Village Apartments notified Sampson that it would be filing for eviction against her. (Tr. 11.)

---

[29]Somatoform disorder is any group of psychological disorders that is marked by physical complaints, for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved. Merriam-Webster's Online Medical Dictionary, http://medical.merriam-webster.com/medical/somatoform. (Last visited August 8, 2008).

[30]Hyperlipidemia is the presence of an abnormally large amount of lipids in the circulating blood. Stedman's Medical Dictionary, 741, 884.

**Testimony at the Hearing**

On November 9, 2006, Sampson testified before the ALJ. Sampson completed high school and one year at Ferguson Beauty College. She worked for fourteen years as a cosmetologist, and last worked, for five months, as a customer service representative for Wells Fargo. Sampson had trouble focusing, concentrating, remembering things, and performing her job duties at Wells Fargo, and was subsequently fired. She also had trouble working on the computer because of the problems with her wrists and back. At Perry's Salon, Sampson would cut hair, set rollers, use a curling iron, and use a blow dryer. (Tr. 315-19, 326-27.)

Sampson noted pain with her neck, back, feet, hands, and hips. The pain in the neck was by the shoulder and did not radiate. The pain would come and go. The pain in her back was from muscle spasms along her right side, which cut off her breath, and radiated up her back, to her neck, and behind her head. Sampson's hands ached and swelled, and she had little strength. She could no longer turn the curling irons without experiencing pain. Her thumbs got stuck sometimes. The balls of her feet hurt, and she could only stand for a certain length of time. The problems with her feet would come and go. Sampson also noted pain in her hips. Because she did not have any insurance, she did not receive extensive testing. (Tr. 319-23.)

Sampson complained of depression. In January 2006, she saw a neurologist, who prescribed Sampson medication. In March 2005, she saw Linda Camp, a social worker. When she was depressed, Sampson had uncontrollable crying spells, anxiety, and feelings of hopelessness. These symptoms, in turn, produced a wringing in her back. She had the crying spells three times a week. Thinking about her financial situation, her body, and her divorce precipitated the crying spells. Sampson had been sexually abused, by her mother's boyfriend, when she was twelve or thirteen. The abuse went on for seven years, but her family could not afford therapy for her. (Tr. 323-28.)

Sampson had trouble sleeping sometimes. Her social worker noted she had difficulty coping, but she did not have any thoughts of harming herself. At the time of the hearing, Sampson was living with a young woman who had offered her a place to stay. She had been living with her

since September 2006, after she was evicted from her apartment. Sampson's income was a little over $600 a month, which came from her ex-husband's pension. Sampson spent her time studying for an insurance test, so she could work for Primerica Financial Services. The studying was frustrating, because she had trouble retaining what she was reading. (Tr. 328-29.)

Brenda Young, a vocational expert (VE), testified at the hearing. The ALJ asked Young to assume that Sampson could lift and carry up to twenty pounds occasionally and ten pounds frequently, and could sit, stand, or walk for six hours in an eight-hour workday. She also assumed that Sampson was able to understand, remember, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, adapt to routine, simple work changes, and avoid hazards. Assuming these characteristics, the VE did not believe Sampson could return to her past relevant work. The VE did believe Sampson could perform other light work in the national and state economy, such as a file clerk or light janitorial type of work. The VE stated that her testimony was consistent with the <u>Dictionary of Occupational Titles</u> (DOT). (Tr. 330-31.)

If the VE assumed Sampson was unable to stand for prolonged periods, the light jobs would be eliminated, but Sampson could still perform entry-level sedentary jobs. If the VE assumed Sampson had continuous problems with the use of her hands and arms, the sedentary jobs would be reduced or eliminated. If the VE assumed Sampson would have uncontrollable crying spells three times a week, with episodes of anxiety and problems focusing her attention and maintaining concentration, the VE believed she would have difficulty completing required job tasks. (Tr. 331-32.)

Sampson's lawyer had requested a psychological consultative examination, but the ALJ decided not to have one done because the medical evidence did not include any objective rating from a psychiatrist or psychologist. (Tr. 331-34.)

### III.  DECISION OF THE ALJ

The ALJ found Sampson suffered from depression and neck and shoulder sprains, and that these impairments were severe.  Despite these impairments, the ALJ concluded that Sampson was not disabled.  Her physical therapy notes indicated she was doing a lot better.  On discharge, she was considered to have obtained her pre-injury level of function.  She told Dr. Hartman, her gynecologist, that she was doing well and did not have any major complaints.  During another visit, Sampson told Dr. Hartman that she had lost her job at Wells-Fargo because of downsizing - and not because of an inability to function based on back spasms.  Other medical visits showed Sampson had full range of motion, full muscle strength, was performing household chores, and that her depression had decreased.  (Tr. 15-18.)

The ALJ discounted the opinion from Linda Kamp, a social worker, that Sampson had trouble coping because of depression and anxiety.  Kamp's opinion was not supported by objective findings, was inconsistent with Sampson's lack of psychiatric treatment, and was outweighed by the opinions and records of Sampson's medical doctors.  Sampson did not seek psychiatric treatment, and did not regularly seek mental health treatment.  She stopped taking her anti-depressants on her own.  Dr. Cason found Sampson was alert and well-oriented.  Dr. Landau found she had only moderate depression, and there is no evidence Sampson returned for a scheduled follow-up with Dr. Landau.  The ALJ noted that Sampson had not alleged mental health problems in her application.  (Tr. 17-19.)

The ALJ found Sampson's daily activities were inconsistent with an inability to perform light work because of disabling impairments.  She lived independently and did her own household chores.  She regularly left her home for a variety of public activities.  Her frequent church attendance and regular shopping were inconsistent with an inability to be around other people because of disabling depression or anxiety.  Her frequent reading and the ability to use a checkbook and money orders were inconsistent with an inability to concentrate because of disabling physical or mental conditions.  (Tr. 18.)

Other factors also indicated Sampson's impairments were not disabling.  She did not take strong pain relief medication.  She

complained of back and hip problems, but bone density studies came back normal. The evidence showed that Sampson's impairments could be treated with medication, and that she had never been refused treatment because of an inability to pay. The medical record showed Sampson never needed prolonged hospitalization, another rotator cuff surgery, or a different type of surgery. None of her doctors imposed any long-term, significant mental or physical limitations. (Tr. 19.)

The ALJ found certain discrepancies detracted from Sampson's credibility. She reported different dates for her rotator cuff surgery, and she testified that she lost her job at Wells-Fargo because of her back spasms, yet told Dr. Hartman she lost her job because of downsizing. (Tr. 20.)

Taken as a whole, the ALJ found Sampson had the residual functional capacity (RFC) to frequently lift up to ten pounds, occasionally lift up to twenty pounds, and could sit, stand, and walk for six hours in an eight-hour workday. Because of her depression and anxiety, the ALJ found Sampson had moderate limitations in social functioning, concentration, persistence, and pace, and mild limitations in daily living activities. She was able to understand, remember, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting, adapt to routine changes, and avoid hazards. Based on this RFC, the VE testified that Sampson could not perform her past relevant work, but could perform work as a file clerk or janitor. Since she could perform work in the national economy, the ALJ concluded Sampson was not disabled within the meaning of the Social Security Act. (Tr. 20-23.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." <u>Id.</u> In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as

supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d
1010, 1012 (8th Cir. 2000).  As long as substantial evidence supports the
decision, the court may not reverse it merely because substantial
evidence exists in the record that would support a contrary outcome or
because the court would have decided the case differently.  See Krogmeier
v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

      To be entitled to disability benefits, a claimant must prove she is
unable to perform any substantial gainful activity due to a medically
determinable physical or mental impairment that would either result in
death or which has lasted or could be expected to last for at least 12
months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A).  A
five-step regulatory framework governs the evaluation of disability in
general.  See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert,
482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner
v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner
finds that a claimant is disabled or not disabled at any step, a decision
is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4);
416.920(a)(4).

      In this case, the Commissioner determined that Sampson could not
perform her past work, but that she maintained the RFC to perform other
work in the national economy.


## V.  DISCUSSION

      Sampson argues the ALJ's decision is not supported by substantial
evidence.  First, Sampson argues the ALJ failed to properly consider all
of her medically determinable impairments.  Second, Sampson argues the
ALJ failed to properly evaluate her residual functional capacity.  Third,
Sampson argues the ALJ's hypothetical question to the VE did not capture
the concrete consequences of her impairments.  (Doc. 16.)


**Medically Determinable Impairments**

      Sampson argues the ALJ did not properly consider all of her
medically determinable impairments.  In particular, she argues the ALJ
failed to articulate a legally sufficient rationale for not considering

her complaints of right leg pain, carpal tunnel syndrome, anxiety, and somatic disorders relating to her depression.

At the second step of a disability determination, the ALJ considers the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). To be severe, the impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). To be severe, the impairment must also be expected to result in death, or be expected to last (or have lasted) for a continuous period of twelve months. 20 C.F.R. §§ 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. If the claimant does not have a severe medically determinable impairment, or a combination of impairments that are severe, then the claimant's impairments are not disabling and the ALJ need not proceed further. 20 C.F.R. § 404.1520(a)(4)(ii).

The ALJ determined that Sampson suffered from a neck and shoulder sprain and depression, and that these impairments were severe. Because of their severity, these impairments limited some of Sampson's functioning. Beyond those impairments, however, the ALJ found the medical evidence failed to "establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment." (Tr. 20.) Looking to the medical record, substantial evidence supports the ALJ's determination of which alleged impairments were severe and limiting, and which alleged impairments were not severe, not limiting, and consequently, not worthy of further discussion. See 20 C.F.R. § 404.1520(a)(4)(ii).

In his decision, the ALJ referred to Sampson's allegations of right leg shaking, but did not find her right leg pain to be a severe impairment. (Tr. 16-17.) Sampson first noted that her leg shook on January 13, 2006. She noted problems with the shaking, for a second time, on January 27, 2006. After that date, Sampson did not have any more complaints about her right leg shaking. Because there is no indication that the leg shaking lasted more than two weeks, Sampson's complaints of right leg shaking do not meet the duration requirement. See 20 C.F.R. § 404.1509. In addition, there is no evidence the shaking was limiting in any way. Sampson had a normal gait, there was no pain

associated with the shaking, and she was able to make the shaking stop voluntarily. Sampson's right leg shaking was not a severe impairment. See Hughes v. Apfel, No. CIV JFM 00-2394, 2001 WL 697845, at *5 (D. Md. May 30, 2001) (adopting report and recommendation of magistrate judge) (finding ALJ did not err by failing to address an alleged condition that did not meet the durational requirement).

The ALJ made no specific mention of Sampson's carpal tunnel syndrome, though he did include a reference to her arm pain. (Tr. 17.) Sampson was first diagnosed with carpal tunnel syndrome on January 27, 2006. She was diagnosed again on June 23, 2006. While her carpal tunnel syndrome might have been expected to endure for at least twelve months, there is no evidence it was limiting. The medical record showed Sampson could write and hold a cup of coffee without any help, had full grip strength in each hand, and that there was no evidence of any fracture, dislocation, or other bony pathology in her right wrist. Sampson's carpal tunnel syndrome was not a severe impairment. See id. (finding ALJ did not err by failing to address an alleged condition that did not meet the definition of impairment).

The ALJ found Sampson suffered from depression, and that her depression was a severe impairment. The ALJ did not make a similarly explicit finding concerning Sampson's anxiety. However, the ALJ found that Sampson's frequent reading and use of a checkbook were inconsistent with an inability to concentrate because of "depression/anxiety." (Tr. 18.) The ALJ noted that Sampson had been treated for "symptoms of depression and anxiety." (Id.) Later in the opinion, the ALJ concluded Sampson's symptoms of "shoulder, spine, and hip discomfort and depression/anxiety can be controlled with medication." (Tr. 19.) And when formulating her RFC, the ALJ described what limitations were "due to depression/anxiety . . . ." (Tr. 20.) Looking to the decision, it seems clear that the ALJ adequately considered Sampson's anxiety in determining her limitations.

The ALJ included one reference to Sampson's somatoform impairment. (Tr. 17.) Sampson was diagnosed with somatoform symptoms on January 27, 2006. This was the only time she was diagnosed with somatoform symptoms. There is thus no evidence that her somatoform symptoms could be expected

-23-

to endure for at least twelve months.  Sampson's somatoform symptoms were not a severe impairment.  See Hughes, 2001 WL 697845, at *5.

The ALJ properly considered Sampson's medically determinable impairments.

**Residual Functional Capacity (RFC)**

Sampson argues that there is no medical evidence to support the ALJ's RFC determination.  She argues that the ALJ should have ordered a consultative examination, and thus failed to properly develop the record. She argues the ALJ failed to properly consider the opinion of Linda Kamp. Finally, she argues the ALJ improperly concluded that her depression had not met the twelve-month duration requirement.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  Id.  Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record.  Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ found Sampson was capable of frequently lifting up to ten pounds, occasionally lifting up to twenty pounds, and sitting, standing, and walking for six hours in an eight-hour workday. Because of her depression and anxiety, the ALJ found Sampson had moderate limitations in social functioning, concentration, persistence, and pace, and mild limitations in daily living activities.  Nonetheless, the ALJ found Sampson was able to understand, remember, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting, adapt to routine changes, and avoid hazards.  Substantial medical evidence supports these determinations.

-24-

Sampson stated she became unable to work on May 2, 2001. In June 2001, she had right rotator cuff surgery. In July 2001, her incision was healing well and she had no evidence of inflammation or infection. In August 2001, she noted leaving her house regularly, going to therapy, Bible study, the grocery store, and church. She was able to do some light cleaning and could wash her clothes. She had no trouble getting along with others. In September 2001, Sampson reported her shoulder was getting better, and that she was starting to feel stronger. In October 2001, she denied any joint, neck, or back pain. In December 2001, Sampson's range of motion had become extremely functional.

In February 2002, Sampson had regained her pre-injury level of function. In June 2002, Sampson told the Social Security Administration that she was recovering very well and did not see the need to appeal a previous denial of benefits. In December 2003, x-rays revealed normal bone mineral density for her hip and lumbar spine.

In July 2005, Sampson reported being able to prepare meals, go for walks, clean her house, iron, and use public transportation. She did not need encouragement to do these things. In August 2005, Dr. Cason found Sampson had normal range of motion in her back without any tenderness or spasms. Her gait and station were normal, and she was able to heel, toe stand, and squat. She had normal muscle strength in her upper and lower extremities. She had full grip strength in both hands, and could use her hands to write and hold a cup of coffee. She was alert and oriented. In September 2005, Sampson noted she bathed regularly and could dress and groom herself. In October 2005, she reported her anxiety had decreased. In November 2005, Dr. Poblete found Sampson had a normal cervical spine and only minimal degenerative joint disease in her shoulder.

In January 2006, Sampson had a flat and appropriate affect. That same month, she had a normal gait, no neck pain, full range of motion, no tenderness, and no evidence of radiculopathy. Dr. Landau found her right shoulder was fine. In April 2006, Dr. Poblete found there was only minimal degenerative joint disease in her right wrist. In November 2006, Sampson testified that she did not have any thoughts of harming herself, and that she had been living with someone for the past two months.

After her physical therapy sessions, Sampson regained her pre-injury level of function in her shoulder. Testing and examinations revealed normal bone densities, normal range of motion, full grip strength, normal muscle strength, a normal gait, no radiculopathy, minimal degenerative joint disease, and a normal cervical spine without any tenderness or spasms. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (finding the ALJ properly discounted claimant's complaints where an MRI revealed largely normal alignment and curvature of the spine, no muscle spasms, and no tender points). After her rotator cuff surgery, none of the doctors recommended surgery or other aggressive forms of treatment. See Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) ("Failure to seek aggressive medical care is not suggestive of disabling pain."). There is no indication any of her doctors imposed any long-term, significant physical limitations. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."). Indeed, Sampson herself told the Social Security Administration she did not see the need to appeal a previous denial. Finally, Sampson noted being able to prepare meals, go for walks, clean her house, attend church and Bible study, dress herself, and use public transportation. See Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for a child, driving, fixing simple meals, doing housework, and shopping for groceries did not support claimant's alleged inability to work).

Sampson never went to a psychiatrist or psychologist. She never received aggressive mental health treatment, and was never hospitalized for mental health reasons. See Chamberlain, 47 F.3d at 1495. She never voiced any suicidal thoughts, delusions, or hallucinations. Her treating doctors found she was alert and oriented, with an appropriate affect. Sampson noted her anxiety had decreased. She was able to get along well with others, attended Bible study, attended church, and lived with someone for two months. After reviewing the medical record, substantial medical evidence supports the ALJ's RFC determination.

Sampson argues the ALJ should have ordered a psychological consultative examination. The ALJ is required to order medical

examinations and tests only if the available medical records do not provide sufficient medical evidence to determine whether the claimant is disabled.  Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).

The record contains several references to Sampson's depression and anxiety, and the ALJ found Sampson's depression was severe.  However, as noted above, there is nothing in the record to indicate Sampson's depression was disabling.  The available medical records provided sufficient evidence from which the ALJ could make a determination.  Combs v. Astrue, 243 F. App'x 200, 205 (8th Cir. 2007) (unpublished per curiam) (where the record indicated the claimant's depression was not disabling, the ALJ did not err by failing to order a psychiatric examination).  The ALJ fully developed the record.

Sampson briefly mentions the ALJ's duty to recontact treating physicians for clarification.  Under the social security regulations, "[t]he ALJ is required to recontact medical sources . . . only if the available evidence does not provide an adequate basis for determining the merits of the disability claim."  Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004); see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).  The ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).  In this case, the available evidence in the record provides an adequate basis for determining the merits of the disability claim.  The ALJ did not need to recontact any of Sampson's treating physicians.

Sampson argues the ALJ failed to properly consider the opinion of Linda Kamp under Social Security Ruling 06-3p.  Social Security Ruling 06-3p provides the ALJ with guidance for considering the opinions of non-medical sources - such as social workers.  S.S.R. 06-3p, 2006 WL 2329939, at *5 (Soc. Sec. Admin. Aug. 9, 2006).  Under the ruling, the ALJ should consider the relationship between the claimant and the source, the source's qualifications, the source's area of expertise, the evidence presented by the source, whether the source's opinion is consistent with other evidence, and any other factors that tend to support or refute the source's opinion.  Id.

The ALJ considered Linda Kamp's opinion, but found her opinion was inconsistent with the medical evidence in the record, and was outweighed by the opinions and records of Sampson's treating physicians. Looking to the record, there is no indication how frequently, and for how long, Kamp met with Sampson. Kamp does not provide any specific evidence to support her conclusions. Instead, her opinion is in the form of a "To Whom It May Concern" letter. Under Social Security Ruling 06-3, the ALJ properly discounted Kamp's opinion.

Finally, Sampson argues the ALJ improperly concluded that her depression had not met the twelve-month duration requirement. In his written opinion, the ALJ found that Sampson "does not have a disabling psychiatric impairment, especially on a twelve-month durational basis with compliance with treatment directives." (Tr. 18.) While the exact meaning of this sentence is not entirely clear, the ALJ was not concluding that Sampson's depression failed to meet the twelve-month durational requirement. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (an arguable opinion-writing deficiency is not a basis for overturning an administrative finding, provided the deficiency has no bearing on the outcome). After all, the ALJ found Sampson suffered from severe depression – a finding that necessarily required the ALJ to have determined that the impairment satisfied the duration requirements of 20 C.F.R. § 404.1509. See 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ did not conclude that Sampson's depression failed to meet the twelve-month duration requirement.

**Hypothetical Question**

Sampson argues the ALJ's hypothetical question to the VE did not capture the concrete consequences of her impairments.

The Commissioner can rely on the testimony of a VE to satisfy his burden of showing that the claimant can perform other work. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies. Id. The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need

include "only those impairments that the ALJ finds are substantially supported by the record as a whole." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006).

The ALJ's hypothetical question had the VE assume that Sampson could lift and carry up to twenty pounds occasionally and ten pounds frequently, and could sit, stand, or walk for six hours in an eight-hour workday. The ALJ also had the VE assume that Sampson was able to understand, remember, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, adapt to routine, simple work changes, and avoid hazards. This hypothetical corresponded to the ALJ's RFC determination. Looking to <u>Lacroix</u> and <u>Robson</u>, the hypothetical question to the VE was correctly phrased and captured the consequences of Brannon's impairments.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g). The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


     /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 19, 2008.